In re MacDOUGALL.

(District Court, N. D. New York.    January 6, 1909.)

1. BANKRUPTCY (§ 189*)—LIENS—FRAUDULENT CONVEYANCES.
    Where a bankrupt, while in good credit, procured claimants to assign
to him a policy on his life that he might use the same as security for a
$12,000 loan, on an agreement that the policy should only be used after a
mortgage on a farm and another policy had been exhausted, and the
mortgage on the farm remained an apparent lien of record until after
bankruptcy, though the bankrupt's agent, on paying the debt to the mort-
gagee from the loan, took a satisfaction which was not recorded, the
bankrupt's creditors were not entitled to object to claimants' alleged
right to reimbursement from the proceeds of a sale of the farm for the
amount of their policy used in payment of the loan; the creditors not
having been misled or induced to give credit to the bankrupt on the faith
or belief that he owned the farm free from incumbrances.
    [Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 189.*]

2. BANKRUPTCY (§ 11*)—COURTS—JURISDICTION—ASSETS IN OTHER STATES.
    Adverse claimants in bankruptcy proceedings may, in the proper case,
sue or be sued in the Circuit Court of the United States, when the bank-
rupt might have sued there on the same cause of action, viz., where there
is a diversity of citizenship and the requisite amount is involved.
    [Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 11.*
    Jurisdiction of federal courts in suits relating to bankruptcy, see note
to Bailey v. Mosher, 11 C. C. A. 313.]

3. BANKRUPTCY (§ 210*)—JURISDICTION—LIENS—ADVERSE CLAIMS—"PROCEED-
    ING IN BANKRUPTCY"—"CONTROVERSY."
    When an adverse claimant voluntarily comes into a court of bankrupt-
cy and claims property in the possession of the trustee, wherever situated,
or asserts a lien thereon and seeks to have it established, enforced, or
protected, the proceeding becomes a "proceeding in bankruptcy" in the
course of collecting the estate, reducing the same to money, and distrib-
uting the same, and a "controversy" in relation to the estate within the
jurisdiction of the bankruptcy court, under Bankr. Act July 1, 1898, c.
541, § 2, subd. 7, 30 Stat. 546 (U. S. Comp. St. 1901, p. 3421), giving such
court jurisdiction of proceedings to cause the estates of bankrupts to be
collected, reduced to money, and distributed, and to determine controver-
sies in relation thereto, except as otherwise provided.
    [Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 210.*
    For other definitions, see Words and Phrases, vol. 1, pp. 703-704.]

4. TRUSTS (§§ 17, 18*)—CREATION—PROOF.
    A valid trust may be created and proved by parol.
    [Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 15-24; Dec. Dig.
§§ 17, 18.*]

5. TRUSTS (§ 340*)—MISUSE OF SECURITIES—PLEDGES—LIEN ON TRUSTEE'S
    PROPERTY.
    A bankrupt, while in good credit, had a Missouri farm mortgaged for
$10,000, for which debt a life insurance policy was also pledged, and, de-
siring to make a new loan for $12,000, induced claimants, his children,
who were beneficiaries in another policy, to assign the same to him that
he might use it as security, agreeing that the farm should be first used
to pay the debt, then his own policy, and claimants' policy only in the
event that the other security was insufficient. Held, that the bankrupt
held the claimants' policy in trust to pledge the same only in accordance
with the agreement; and hence, the proceeds thereof having been used
to pay the debt before the proceeds of the farm, claimants were entitled

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to have the trust transferred to the proceeds of the farm and to reimbursement therefrom.

[Ed. Note.—For other cases, see Trusts, Dec. Dig. § 340.*]

6. **SUBROGATION** (§ 25*)—OWNERS OF PLEDGED PROPERTY.

Claimants were also entitled to subrogation to the rights of the creditor loaning the money for which the securities were pledged and to reimbursement on that theory.

[Ed. Note.—For other cases, see Subrogation, Dec. Dig. § 25.*]

7. **BANKRUPTCY** (§ 214*)—CLAIMS—LIENS—FABRICATION—EVIDENCE.

Evidence held insufficient to warrant a finding that claimants had conspired with their father, the bankrupt, to establish a lien on certain property pursuant to a contract by which they loaned the bankrupt a life insurance policy to be used only as third security for his debt.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 214.*]

8. **BANKRUPTCY** (§ 188*)—BARRED COLLATERALS—PLEDGE—LIENS—AMOUNT.

Where claimants loaned the bankrupt, their father, a life insurance policy, to be used only as third security for a loan, subsequent to a farm and another policy, and the policy was in fact pledged for certain other indebtedness, of which the claimants had no knowledge, and, on bankruptcy intervening, the policy was surrendered and its proceeds used in payment of the debt in exoneration of the farm, claimants were entitled to a lien on the proceeds of the farm to an amount not exceeding the proceeds of the policy, less the amount used therefrom to pay the additional debt of the bankrupt for which the policy was pledged.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 188.*]

In the matter of Clinton D. MacDougall, bankrupt. On proceedings to review a referee's order directing the trustee to pay over to William D. MacDougall and others $7,575.90 from the proceeds of a farm owned by the bankrupt at the date of his adjudication, with interest at 3 per cent. per annum. Modified.

Harold Stone, for claimants.
J. Henry Kerr, for trustee.

RAY, District Judge. During all of the time mentioned herein the now bankrupt was the owner of a farm in the state of Missouri which, since the appointment of the trustee herein, was sold by him for the sum of $15,000 under an agreement that the proceeds shall take the place of the land and be held to await the adjudication of the rights of the parties in and to such fund. A part of the proceeds of a certain life insurance policy on the life of said bankrupt, payable to the claimants above named, is being held by the trustee in the same way; the contention being that the proceeds of the land itself should be used to satisfy certain indebtedness of the bankrupt for which the life insurance policy was held as collateral security by a third party, or by third parties, so as to release the proceeds of such insurance policy to the amount stated to the said claimants. As the creditors holding the insurance policy as collateral had no notice of the rights, if any, of the claimants, the referee ordered such debts paid from the proceeds of the insurance policy, and the balance held. The claimants contend that in equity their rights are transferred to the real estate fund and are to be satisfied therefrom.

In or about the year 1882 the now bankrupt executed and delivered a note of $10,000, representing a loan to that amount, to one John Hunter, and as security executed a mortgage or trust deed on said farm. As further collateral security there was assigned an insurance policy on the life of the bankrupt for the sum of $10,000, payable to the bankrupt or his legal representatives. This loan was due and payable 10 years from that date. This note and mortgage, or trust deed, and policy, were duly transferred by Hunter to one Erastus Holden, since deceased. In or about the month of January, 1903, the legal representatives of said Holden, he being dead, demanded payment of said note. The now bankrupt, through his duly authorized agent, D. B. Cooper, thereupon made an effort to secure a loan of $12,000 from the Fidelity Trust Company, of Rochester, N. Y. The said Trust Company either refused to take the mortgage at all as security for the desired loan, or demanded additional security. So far as the Trust Company alone is concerned, that question is immaterial, as it did not take the mortgage or an assignment thereof.

At the time the bankrupt desired to make this loan of $12,000 he had a policy of life insurance on his own life, No. 181,526, payable to said claimants, William D. MacDougall, Jessie S. Balcom, and Margaret M. Carr, who were the children of said bankrupt. The bankrupt had always paid the premiums thereon. The bankrupt thereupon represented to the claimants, the beneficiaries in said last-named policy of insurance, that he needed the money, $12,000, and that the loan, if made, would be and was to be secured by the said mortgage or trust deed on said farm, and by said first-mentioned policy of insurance on his own life, payable to his estate or legal representatives, but that he must give additional security if he obtained the money, and that he desired an assignment of such policy, No. 181,526, payable to them, to use as additional collateral security for such loan, and that, if so assigned to him, it would be used as third collateral for such loan of $12,000 to be made to him; that is, that the farm and other policy would be first collateral, first to be exhausted for the payment of such loan in case of default, and that the policy payable to the children, claimants here, or its proceeds, would only be liable or used to satisfy such loan after the exhaustion of the farm and the said first-mentioned policy.

The contention is that, relying on this statement and representation, the said claimants assigned the policy, No. 181,526, to said bankrupt, with the agreement and understanding he was to use it for the purpose and under the conditions mentioned, and no other, and that, when the debt of $12,000 was paid, said farm and other insurance first to be exhausted for the purpose, the said policy was to be reassigned to them. The claimants did assign the policy to the now bankrupt, and he in turn assigned it as collateral for the loan of $12,000 with the other policy of insurance. His agent, doing the business, did not cause the mortgage to be assigned, but took a satisfaction instead, and held same unrecorded until after the bankruptcy. If this was the agreement under which the claimants here assigned said policy, No. 181,526, to said bankrupt, it was a mere loan thereof to the now

bankrupt for a special purpose, and, while he apparently had complete title, and could pass title to any one ignorant of the facts, his only title as between himself and his general creditors and the claimants was the right to use such policy as collateral security for the loan of $12.000 in the manner stated; that is, as collateral, to be exhausted or applied only in case the mortgage or trust deed and the other policy of insurance failed or proved inadequate for the purpose of satisfying the loan. If this was the agreement between the now bankrupt and his children, the claimants, and the rights of third innocent parties have not intervened, it is within the power of a court having equitable powers, and having jurisdiction of the parties concerned and of the subject-matter, to see to it that the rights of the claimants are protected; and if the policy, No. 181,526, was used and appropriated in violation of such agreement, or in disregard thereof, whereby the policy was used as first collateral and became primarily liable for the debt of $12,000, and other liens or equities in favor of third persons have not attached to the farm, which was to be the first or primary collateral for the payment of such loan, it would seem clear that a court of equity may and ought to substitute the farm or its proceeds in place of the policy assigned by the children.

If bankruptcy had not intervened, and if the loan of $12,000 had not been paid by the borrower, and if the policy, No. 181,526, payable to the children, used as collateral in place of the mortgage on the farm, or its proceeds, had been used and exhausted to pay such loan by the one making it, would not equity declare a lien on such farm in favor of such children as against general creditors, in case they found themselves without other adequate remedy? It cannot be contended here that any of the general creditors have been misled or induced to give credit to the bankrupt on the faith or belief he owned the farm free and clear of incumbrances, as the agent of the now bankrupt, on securing the loan, took a satisfaction of the mortgage and held it unrecorded, so that such mortgage or trust deed remained an apparent lien on the farm until after the bankruptcy. No other lien or liens on such farm was created at any time, except that Henry H. Cook held a second mortgage of $5,000 on the farm, which was given by his will to the bankrupt and discharged by the executors after the adjudication. No credit was given to the now bankrupt, except the loan of $12,000 and one by Cooper, the agent, hereafter mentioned, on the faith he was the owner of such policy. If the agreement between the bankrupt and his children, these claimants, was as stated, they have a claim against the estate in bankruptcy to the amount claimed, and might present it and allege a lien arising by operation of law and equity on the proceeds of the farm, and ask to have it declared and enforced. Coder v. Arts, 213 U. S. 223, 29 Sup. Ct. 436, 53 L. Ed. 772. This question of jurisdiction and power will be referred to later.

Clearly the claimants may allege their ownership of the policy and its proceeds, and ask to have them returned. If the policy has been used in place of other property of the bankrupt, contrary to the agreement, and the bankrupt estate has that other property, why should it not be substituted for the policy?

This proceeding was instituted in this court before the referee in

bankruptcy on a petition of the claimants, addressed to him as such,. verified in October, 1906, and before the sale of the farm or the collection of the insurance. On the presentation of the petition an order to show cause was issued and served on all the creditors and interested parties, including the trustee. The trustee, David B. Cooper, and the Dundee National Bank, a creditor, answered.

The petition sets forth all the facts, and asks that Nelson Drummond, the trustee, who was in possession of all the property, be directed and required by the court: (1) To pay the $12,000 loan and assign the policy, No. 181,526, to the said petitioners. (2) To sell the farm in Missouri, referred to, and pay the said $12,000 loan from the proceeds, so far as sufficient for the purpose. (3) If the proceeds of the farm prove insufficient, then to sell the policy payable to the insured or his representatives, and apply its proceeds to the payment of the debt, before resorting to the said policy, No. 181,526, so assigned by the petitioners. (4) The petition asks such other or further relief as may be just.

In substance this is an application to the court for an order or judgment directing the trustee, in possession of all the property, real estate, and policies of insurance, subject to the pledge thereof to the Fidelity Trust Company as security for such loan of $12,000 and interest, to carry out and enforce the alleged agreement between the bankrupt and the claimants as to the assignment of such policy and its use as collateral, without interfering with the rights of the Trust Company, by directing the payment of such loan from the proceeds of a sale of the farm before resorting to the insurance policies, and to recognize and enforce their rights in and to such policy of insurance and the moneys received thereon. During the pendency of the proceeding the farm was sold and the insurance collected by the trustee, and the referee made an order directing the payment of the loan and interest from the insurance, as he could not affect the rights of the Trust Company to be paid from that fund.

The trustee objects to the jurisdiction of this court, viz.: (1) That the referee has no jurisdiction of either the subject-matter, or to hear, try, and determine the adverse claims of the petitioners; claims adverse to the trustee, I take it, as they make no claims adverse to the Trust Company. (2) That the trustee has no jurisdiction as to the real estate, same being situated outside the state of New York.

I think these objections are answered by the decided cases, as well as on principle. In Thomas v. Woods (C. C. A., 8th Circuit) 173 Fed. 585, 590, it is held, citing cases:

"The objection of the appellant that the trial court was without jurisdiction of the property, because it was not situated in the district of Kansas, has no merit. Upon the filing of a petition in bankruptcy, all property held by or for the bankrupt is brought within the custody of the court of bankruptcy, and, upon adjudication, that court is vested with jurisdiction to determine all liens and interests affecting it. This jurisdiction is coextensive with the United States. In re Wood & Henderson, 210 U. S. 246, 28 Sup. Ct. 621, 52 L. Ed. 1046; In re Granite City Bank, 137 Fed. 818, 70 C. C. A. 316; In re Muncie Pulp Co., 151 Fed. 732, 81 C. C. A. 116; Guardian Trust Co. v. Kansas City Southern Railway Co. (C. C. A.) 171 Fed. 43; Dempster v. Waters-Pierce Oil Co. (C. C. A.) 172 Fed. 353."

The trustee in bankruptcy represents all the creditors. He may consult with all, and represent and protect their interests. If third persons claim property which has come to the hands of the trustee, and assert a lien thereon, or a claim thereto, or ask to have it returned, may not the bankruptcy court, having possession thereof, and control over the trustee and property, adjudicate all controversies relating thereto, when the parties claimant come voluntarily into that court which has equitable power in the premises?

Section 2 of the act (Act July 1, 1898, c. 541, 30 Stat. 545 [U. S. Comp. St. 1901, p. 3420]) provides:

"That the courts of bankruptcy * * * are hereby invested * * * with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in bankruptcy proceedings * * * to * * * (7) cause the estates of bankrupts to be collected, reduced to money and distributed, and determine controversies in relation thereto, except as herein otherwise provided: * * * (15) make such orders, issue such process and enter such judgments in addition to those specifically provided for as may be necessary for the enforcement of the provisions of this act."

Section 23a provides:

"Jurisdiction of United States and State Courts.—(a) The United States Circuit Courts shall have jurisdiction of all controversies at law and in equity, as distinguished from proceedings in bankruptcy, between trustees as such and adverse claimants concerning the property acquired or claimed by the trustees, in the same manner and to the same extent only as though bankrutcy proceedings had not been instituted and such controversies had been between the bankrupts and such adverse claimants."

If this section was designed to transfer jurisdiction of all questions of title to and liens on property in the possession of the trustee and claimed by him to belong to the estate of the bankrupt, when claimed by third parties, to the Circuit Court of the United States when the necessary amount is involved, and there is the requisite diversity of citizenship, even then that court has no jurisdiction of this question involved here; for, while the amount involved exceeds $2,000, exclusive of interest and costs, there is not the requisite diversity of citizenship as to all the claimants. But that is not the meaning or the proper construction of the section. Adverse claimants may, in a proper case, sue or be sued in the Circuit Courts of the United States when the bankrupt might have sued there on the same cause of action; that is, in case of diversity of citizenship and requisite amount involved. Bush v. Elliott, 202 U. S. 477, 482, 26 Sup. Ct. 668, 50 L. Ed. 1114, cited and approved Murphy v. John Hoffman Co., 211 U. S. 568, 29 Sup. Ct. 154, 53 L. Ed. 327. But when the adverse claimants voluntarily come into the court of bankruptcy and claim property in the possession of the trustee, wherever situated, or assert a lien thereon and seek to have it established and enforced or protected, the bankruptcy court has jurisdiction under subdivision 7 of section 2 of the act, and even independently of that section. Murphy v. John Hoffman Co., 211 U. S. 562, 568, 569, 29 Sup. Ct. 154, 53 L. Ed. 327. This makes it a proceeding in bankruptcy in the course of collecting the estate, reducing same to money, and the distribution thereof, and a controversy in relation to such estate. Murphy v. John Hoffman Co., 211 U. S. 562, 568, 569, 29 Sup. Ct. 154, 53 L. Ed. 327; Wabash Rail-

road v. Adelbert College, 208 U. S. 38, 28 Sup. Ct. 182, 52 L. Ed. 379; Whitney v. Wenman, 198 U. S. 539, 25 Sup. Ct. 778, 49 L. Ed. 1157; White v. Schloerb, 178 U. S. 542, 20 Sup. Ct. 1007, 44 L. Ed. 1183; Hewit v. Berlin Machine Works, 194 U. S. 296, 24 Sup. Ct. 690, 48 L. Ed. 986; Coder v. Arts, 213 U. S. 223, 233, 29 Sup. Ct. 436, 53 L. Ed. 772, where Hewit v. Berlin Machine Works is commented on; In re Rochford, 124 Fed. 182, 59 C. C. A. 388, 10 Am. Bankr. Rep. 608, 614.

In Murphy v. John Hoffman Co., supra, the court said (pages 568, 569, of 211 U. S., pages 156, 157, of 29 Sup. Ct. [53 L. Ed. 327]):

"But where the property in dispute is in the actual possession of the court of bankruptcy there comes into play another principle, not peculiar to courts of bankruptcy, but applicable to all courts, federal or state. Where a court of competent jurisdiction has taken property into its possession, through its officers, the property is thereby withdrawn from the jurisdiction of all other courts. The court having possession of the property has an ancillary jurisdiction to hear and determine all questions respecting the title, possession, or control of the property. In the courts of the United States this ancilliary jurisdiction may be exercised, though it is not authorized by any statute. The jurisdiction in such cases arises out of the possession of the property and is exclusive of the jurisdiction of all other courts, although otherwise the controversy would be cognizable in them. Wabash Railroad v. Adelbert College, 208 U. S. 38, 54 [28 Sup. Ct. 182, 52 L. Ed. 379]."

And in the same case, after referring to Whitney v. Wenman and White v. Schloerb, supra, the court continued:

"The last two cases cited proceed upon and establish the principle that when the court of bankruptcy, through the act of its officers, such as referees, receivers, or trustees, has taken possession of a res, as the property of a bankrupt, it has ancillary jurisdiction to hear annd determine the adverse claims of strangers to it, and that its possession cannot be disturbed by the process of another court. And see Skilton v. Codington, 185 N. Y. 80, 85, 86 [77 N. E. 790, 113 Am. St. Rep. 885], and Frank v. Volkommer, 205 U. S. 521 [27 Sup. Ct. 596, 51 L. Ed. 911], which by implication approve the same principle."

I think this court had jurisdiction of the subject-matter and of the parties in interest, and that it was its duty to hear the allegations and proofs of the parties and determine their claims in and to the property referred to.

We return, then, to the question: What was the right or title of the trustee to this particular policy and its proceeds? If there had been no agreement by the bankrupt to use other specific property as collateral before pledging this policy, these claimants would have no lien on the estate, or any part of it. Their claim would be a general one as creditors of the estate. If claimants had loaned the policy to the bankrupt, making an assignment so he could use it, to use for a specific purpose, but for his own benefit, and he had disregarded that purpose and used it generally in his business, or to obtain money and had used that money generally in his business, they would have no lien on the estate, or on any part of it. The equitable right of the claimants here to be reimbursed from a specific fund, or to have their lien transferred to particular property, grows out of the fact that it was agreed that such particular property, in this case the farm, should be first pledged as security for the loan of $12,000. Equity regards that as done which

ought to have been done, and hence as between the claimants and the bankrupt and his trustee or general creditors, in the absence of intervening equities, the court may treat this matter as though the farm had been pledged as first collateral for the loan, and the policy of insurance, or its proceeds, having been used as first collateral in place of the farm or its proceeds they may be substituted for the policy or its proceeds. It is immaterial whether this was purposely or negligently done by the bankrupt. The agreement under which he took the policy was violated, and its proceeds have gone to satisfy a debt which, as between the bankrupt and these claimants, should have been paid, so far as its proceeds were adequate, from the farm in question. If the assignee of the policy, now the bankrupt, had refused to give up the policy to the children, who doubts he could have been compelled so to do? And if he had irrevocably parted with it to bona fide holders for value, who doubts that such value, if followed and identified in the hands of the bankrupt, would be impressed with a trust in favor of the claimants? So here the farm and its proceeds, that, under the agreement, should have been first used to pay the loan, may be declared impressed with a trust in favor of these claimants as standing in the place of such policy. When this proceeding was instituted, the farm had not been sold or the money paid to the trustee on the insurance policies.

A valid trust may be created and proved by parol. Townsend v. Vanderwerker, 160 U. S. 171, 16 Sup. Ct. 258, 40 L. Ed. 383; Hirsh v. Auer, 146 N. Y. 13, 40 N. E. 397; Matter of Carpenter, 131 N. Y. 86, 29 N. E. 1005. The bankrupt held the legal title to the policy in question, with power to pledge it as security for the loan of $12,000, but subsequent to and as security additional to the mortgage on the farm. The children so understood. This ought to have been done.

"Equity considers things directed or agreed to be done as having been actually performed, where nothing has intervened which ought to prevent a performance." Craig v. Leslie, 3 Wheat. 563, 4 L. Ed. 460; Taylor v. Longworth, 14 Pet. 172, 10 L. Ed. 405.

"A conveyance from trustees, which ought to have been made, will be considered by a court of equity as having been made." Morris v. United States, 174 U. S. 196, 19 Sup. Ct. 649, 43 L. Ed. 946.

There is another equitable ground on which the proceeds of this farm should be held subject to a trust or lien for the benefit of the claimants. The proof is undisputed that from the proceeds of the $12,000 loan, represented by two notes of the bankrupt and secured as hereinbefore stated, the mortgage on this farm was paid and the satisfaction taken and held by Mr. Cooper, as stated; the now bankrupt remaining in ignorance of that fact for two or more years. The policy in question was used as first collateral for the loan, when, under the agreement, a mortgage on the farm should have been. That loan having been used to clear the farm from incumbrance, and the policy of the children having been used to secure and then pay the loan, so far as so used, the farm or its proceeds, in equity and good conscience, ought to go to the claimants. In effect they became surety for the bankrupt on his notes given for a loan which was used to discharge the lien on the farm. The farm, as between the bankrupt and

the claimants, was to be and in equity was primarily liable for the $12,000. The property of the children having been used to pay such loan, to the exoneration of the farm, it ought to be held primarily liable for the debt, and followed as the primary fund for its payment in favor of the claimants, as between them and the general creditors of the bankrupt or his trustee in bankruptcy. 2 Story's Eq. Jur. (11th Ed.) p. 556, § 1248.

The violation of the agreement by the bankrupt operated as a fraud upon the rights of the claimants as much as though one had been intended. The bankrupt held the policy for the special purpose, and when it was diverted or misapplied a trust resulted. If not, then a lien was created on the farm, which was primarily liable under the agreement. Moore v. Williams, 62 Hun, 55, 16 N. Y. Supp. 403; Leary v. Corwin, 181 N. Y. 222, 73 N. E. 984, 106 Am. St. Rep. 542.

The proceeds of the policy of the claimants has gone to enrich or swell the estate of the bankrupt, contrary to the agreement under which it was assigned to him, and it would be inequitable that the general creditors profit from the transaction. The property of these claimants was pledged for a loan to the bankrupt on his notes, the proceeds of which loan was used to pay off and satisfy a mortgage on the farm in question, and such property of claimants has now been used to pay the loan, the debt of the bankrupt. They were compelled to pay it, or to let their property go to pay it. This was not voluntary on their part, but involuntary, as the agreement was the farm should be first liable. The satisfaction of the mortgage, with the mortgage itself, were held by Mr. Cooper, the agent, until after the bankruptcy and the appointment of the trustee. The trustee then caused the satisfaction to be recorded and the mortgage canceled of record. It is substantially a case where the doctrine of subrogation applies, and where the claimants should be held to have a lien on the premises to the extent of the mortgage, $10,000, so far as their policy was used to pay. This came about indirectly, of course; but equitably the claimants were sureties on two notes, of $6,000 each, and the proceeds of those notes was used to pay the mortgage, which claimants supposed stood as first security for such notes, and those notes, by the process described, they have been compelled to pay in the manner stated, in ignorance of the fact that the mortgage was canceled. If the mortgage had not been canceled, but assigned to the Trust Company, and the policy had been used to pay the notes, clearly the claimants would have been entitled to the mortgage on the farm.

From every standpoint it seems clear that in equity these claimants have a lien on the proceeds of the farm. No wrong is done to any other creditor. The doctrine of subrogation is that if A. is liable to B. for the debt of C., as surety for C., and is compelled to pay, he is entitled to stand in the shoes of B. and to any security by way of pledge or collateral which B. holds for the debt. Kolb v. National Surety Co., 176 N. Y. 233, 237, 68 N. E. 247; Cheesebrough v. Millard, 1 Johns. Ch. (N. Y.) 412, 7 Am. Dec. 494. Here B. did not hold the mortgage, but A. supposed he did, and C. had promised he should, and represented that he did. It was canceled with the proceeds of the

loan creating the debt of C., for which A. became surety. The farm, or its proceeds, exists and is in court, subject to no other equities. Can there be a plainer case of equitable right to a lien on such farm, or its proceeds, aside from a duly executed written instrument?

It is now settled that this trustee took the property of the bankrupt charged with all the valid equities and liens existing prior to the adjudication, and in the same plight and condition the bankrupt himself held it, and subject to all the equities impressed upon it in the hands of the bankrupt. Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. 577, 13 Am. Bankr. Rep. 437, 445; Matter of Alden, 16 Am. Bankr. Rep. 362, 370; In re N. Y. E. P. Co., 110 Fed. 514, 49 C. C. A. 133; Collier on Bankruptcy (7th Ed.) 810.

But it is contended that the evidence is not satisfactory and conclusive as to the rights of the claimants. Whether or not the bankrupt knew the mortgage was paid and a satisfaction executed, instead of being assigned, makes little difference. Cooper testifies that the now bankrupt did not know of the execution of the satisfaction until two or three years after its execution; says he (Cooper) put it in his safe and forgot all about it. There is no pretense that the claimants here knew or suspected that a satisfaction of the mortgage was executed. They were not in a position to know or ascertain, except as represented to them by the now bankrupt. One was on the high seas in the naval service, another residing in Virginia, and the third in Elmira. The now bankrupt did not anticipate any financial catastrophe or bankruptcy. It well may be that, if he ever knew the satisfaction, instead of an assignment, was executed, and Cooper says two or more years passed before he told him, the fact passed from his mind. Neither the mortgage nor the satisfaction was delivered to him. It remained with Cooper, who did the business. Why is not disclosed. As to the now bankrupt it was outstanding, as was the indebtedness.

The letters that passed between the now bankrupt and the claimants, asking for and resulting in the assignment of the policy, and containing the agreement and representations, were family letters, passing between father and children. I see nothing strange in the statements that these were all destroyed; that such was the custom of the writers. There is no evidence that bankruptcy was contemplated or apprehended. The children evidently expected to come into their father's property on his death, and there was nothing in the situation that seemed to demand the preservation of the letters. There is nothing in the case to arouse suspicion that the contents of the letters has been misrepresented, or that the letters were destroyed with any evil intent, or any purpose to destroy or suppress evidence. So far as my experience or knowledge goes, it is the rule to destroy family letters. I do not think these children have conspired with the father to concoct this story or to defraud the estate. I find nothing in the case to justify such a conclusion. It is not conceivable that these four persons would or could do so. Had such been their purpose, a writing could easily have been fabricated. The story of each was told when far separated from the others. I am satisfied the policy was assigned under the circumstances and agreement and for the purpose stated. The premiums

were paid when the insured was in good financial condition. There is no suspicion that his estate was being covered into insurance on his life with any purpose to depreciate it or defraud creditors, or that it had such effect.

Has the referee erred in fixing the amount of the lien or the amount that should be paid the children. The original loan and indebtedness was $10,000. The loan from the Fidelity Trust Company to the now bankrupt was made January 7, 1903, amounted to $12,000, and was represented by two notes, of $6,000 each, indorsed by D. B. Cooper.

One of these notes was secured by collateral, policy No. 165,383, payable to insured or his legal representatives, and assigned January 7, 1903, to said Trust Company. This same policy was assigned by the insured, the bankrupt, to David B. Cooper, on the 30th day of June, 1904, as collateral security for the payment of an indebtedness of $2,000, of which the claimants had no knowledge. This policy, under direction of the court, was surrendered to the Insurance Company May 8, 1908, on payment of its cash surrender value, $7,430, to the trustee in bankruptcy.

The other note mentioned was secured by collateral, policy No. 181,526, payable to the claimants here, but assigned by them to the insured, the bankrupt, under the agreement hereinbefore mentioned, on or about January 3, 1903, and by him assigned as collateral to said Trust Company January 7, 1903. This policy was also assigned by said insured, the bankrupt, to said D. B. Cooper, June 30, 1904, to secure the said indebtedness to him of $2,000. May 8, 1908, by the direction of the court, it was surrendered to the Insurance Company on payment to the trustee of its cash surrender value, $7,430, and later a dividend of $98.90 was paid thereon, making its proceeds $7,528.90.

The proceeds of both policies was $14,958.90. The assignments to Cooper were subject to the assignments to the Trust Company. The amount due Cooper, and for which the two policies stood as collateral at the time of payment, was $797.13. One-half is $398.56. As this last amount, $398.56, went to Cooper to pay his claim, and was a pledge of policy No. 181,526 by the bankrupt in violation of the agreement and for another and an independent debt of the bankrupt, I do not see that the claimants have any recourse in equity, or that this amount can be paid them from the proceeds of the farm or policy payable to the estate. This amount of the proceeds of the policy was not used directly or indirectly to release the farm, pay the mortgage, or any part of the loan of $12,000 made by the Trust Company, the proceeds of which were used, mostly at least, to pay the mortgage debt. This was an outside debt, not within the terms of the agreement or the contemplation of the parties. In no event have the claimants a lien for more than $7,130.34, being the proceeds of policy No. 181,526, less the $398.56, necessarily used therefrom to pay the Cooper debt.

The farm was to stand as first security for the $12,000 loan. Next the policy payable to the insured or to his representatives. The loan was divided into two notes. The amount of each, with interest, was $6,298.66; that of both, $12,597.32. Deducting the policy payable to the estate, $7,430, and the balance is $5,167.32. But the mortgage was to stand as first security for both at $10,000, and the policy payable to

the estate as second, $7,430, making $17,430. This would have more than paid both notes. But the farm having been released, and the first policy, payable to the estate, pledged to one note only, $6,298.66 was left unpaid, and as the policy of claimants was pledged for that it has been so used, viz., $6,298.66 thereof. Deducting from its proceeds, $7,528.90, the amount used to pay Cooper's debt, $398.56, we have $7,130.34 remaining. Deducting the $6,298.66 used to pay the Trust Company's note, and we have a surplus of $831.58, that should be returned to claimants in any event. Add this to the amount necessary to pay the Trust Company's debt that should have been paid from the mortgage, or farm, and we have $7,130.34 to be returned or paid over. In short, the claimants never lost their right to that surplus. It has remained theirs. They did lose their right to the $398.56 that went to Cooper, so far as any lien is concerned. It could have been presented as a claim. As to the balance, $6,298.66, which should have been paid from the farm, they do have a lien.

| | |
|---|---|
| Proceeds of policy | $7,528 90 |
| Lost by Cooper pledge | 398 56 |
| | |
| Lien | $7,130 34 |
| | |
| Used to pay Trust Company loan | $6,298 66 |
| Balance in hands of trustee | 831 68 |
| | $7,130 34 |

As the proceeds of the policy were $7,528.90, less $398.56 paid Cooper, or $7,130.34, and it paid $6,298.66, when it should have paid only $5,167.32, if the first policy had been pledged and applied as agreed, it paid $1,131.34 more than it should, and instead of having a balance on hand of $1,963.02, we have a balance of $831.68. The difference is $1,131.34. The claimants should have a lien:

| | |
|---|---|
| For what their policy should have paid on the note | $5,167 32 |
| For what it paid more than it should | 1,131 34 |
| And should have the actual balance on hand | 831 68 |
| | |
| Total | $7,130 34 |
| | |
| Proceeds of policy | $7,528 90 |
| Deduct amount paid Cooper | 398 56 |
| | |
| Balance | $7,130 34 |
| Debt | $12,597 32 |
| Apply policy 165,383 | 7,430 00 |
| | |
| Balance for policy 181,526 | $5,167 32 |
| | |
| True balance that should be on hand | $1,963 02 |
| Actual balance | 831 68 |
| | |
| Paid more than should if first policy applied to whole debt | $1,131 34 |
| Should have paid | 5,167 32 |
| Actual balance | 831 68 |
| | |
| Amount claimants entitled to | $7,130 34 |

I know of no theory on which interest can or should be allowed claimants, unless the fund has been drawing interest. The fund is in

court, and has been, and the estate cannot be charged interest, unless the fund itself has earned it. The claimants are entitled to such interest as the fund has actually earned since it was received, and no more.

There will be an order modifying the order under review accordingly, and, as modified, it will be affirmed.